1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2

3

4    United States of America,      )
                    Plaintiff,      )
5                                   )
                                    )
6    vs.                            )   Case No. 20-cr-40036-TSH
                                    )
7                                   )
                                    )
     Vincent Kiejzo,                )
8                   Defendant.      )

9

10   BEFORE:  The Honorable Timothy S. Hillman

11

12                          Motion Hearing

13

14

15                              United States District Court
                                Courtroom No. 2
16                              595 Main Street
                                Worcester, Massachusetts
17                              March 17, 2022

18

19

20

21

22

23                  Marianne Kusa-Ryll, RDR, CRR
                       Official Court Reporter
                    United States District Court
24                   595 Main Street, Room 514A
                      Worcester, MA 01608-2093
25                 508-929-3399 justicehill@aol.com
                Mechanical Steno - Transcript by Computer

1    APPEARANCES:

2    United States Attorney's Office
     Kristen Noto, Assistant United States Attorney
3    Donohue Federal Building & Courthouse
     595 Main Street, Suite 206
4    Worcester, Massachusetts 01608
     on behalf of the Government
5
     Federal Public Defender Office
6    Sandra Gant, Assistant Federal Public Defender
     Caitlin Jones, Assistant Federal Public Defender
7    District of Massachusetts
     51 Sleeper Street, 5th Floor
8    Boston, Massachusetts  02210
     on behalf of the Defendant
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>P R O C E E D I N G S</u>

1

2          (The following proceedings were held in open court

3   before the Honorable Timothy S. Hillman, United States District

4   Judge, United States District Court, District of Massachusetts,

5   at the Donohue Federal Building & United States Courthouse,

6   595 Main Street, Worcester, Massachusetts, on March 17, 2022.)

7          THE CLERK:  All rise.

8          Court is now open.  You may be seated.

9          Case No. 20-40036, United States versus Vincent

10  Kiejzo.

11         Counsel, please note your appearance for the record.

12         MS. NOTO:  Good afternoon, your Honor.  Kristen Noto

13  for the United States.

14         THE COURT:  Good afternoon, Ms. Noto.

15         MS. GANT:  Good afternoon, your Honor.  Sandy --

16  Sandra Gant on behalf of Mr. Kiejzo.  Along with me is Caitlin

17  Jones from my office as well.

18         MS. JONES:  Good afternoon, your Honor.

19         THE COURT:  Good afternoon, both of you.

20         And good afternoon, Mr. Kiejzo.

21         THE DEFENDANT:  Good afternoon.

22         THE COURT:  So this is your party.  Why don't you

23  start.

24         MS. GANT:  It is.  Thank you, your Honor.

25         MS. NOTO:  Your Honor, if I may, we requested an in

1   hearing -- an in-person hearing on this matter, because we

2   learned that the magistrate held a discovery motion that it was

3   very difficult to argue the motion without referencing matters

4   that are under seal and that sidebars on Zoom became

5   complicated as a question of an open or closed court, so we

6   have practiced referring to these matters without identifying

7   the matters under seal, but to the extent that we need to

8   address those, since the court is open, we may ask to approach

9   sidebar.

10          THE COURT:  The other thing -- well, sure.

11          MS. NOTO:  I don't think it will be necessary really

12   for us to do that.

13          THE COURT:  Okay.

14          MS. NOTO:  Thank you.

15          THE COURT:  All right.  Thanks.

16          MS. GANT:  Would it be okay if I stepped to the

17   podium?

18          THE COURT:  I would prefer it actually.

19          MS. GANT:  My glasses tend to -- tend to fog so...

20          On behalf of Mr. Kiejzo, we're asking the Court to

21   find that Judge Hennessy's denial of his motion to compel

22   discovery was predicated on a number of incorrectly

23   misconstrued facts and assumptions and was contrary to law.

24          Before getting into those two big points, I'd like to

25   give the Court at least a kind of global big picture, maybe

1     bird's-eye view of the case and the reasons for the discovery

2     requests themselves.

3              The government sought a search warrant for

4     Mr. Kiejzo's home and devices based on a search warrant

5     affidavit that relies in terms of probable cause entirely on a

6     foreign law enforcement tip regarding a single site visit by an

7     IP address to two Tor hidden service websites on a single day

8     in May 2019.

9              And that foreign law enforcement tip, the government

10    alleges, originated from a foreign law enforcement country with

11    a history of providing information to U.S. law enforcement, and

12    that that country was a rule -- was a country with a rule of

13    law.  And the search warrant affidavit asserted that that

14    foreign law enforcement agency obtained the tip from its own

15    investigation, and the government ultimately declined to

16    produce information about how that foreign law enforcement

17    agency deanonymized the IP address in this case and what

18    methodology it used.

19             What we now know is that in June 2019, a totally

20    different foreign law enforcement agency, different from what

21    I'll call the tip giving foreign law enforcement agency, seized

22    the computer server hosting these websites, and the --

23             THE COURT:  The tip -- the tip giver was disclosed to

24    you?

25             MS. GANT:  The tip giver was disclosed.

1          THE COURT:  Uh-huh.

2          MS. GANT:  But what was not disclosed was the basis of

3    the tip, the reliability of the tip, the methodology of the

4    tip, the information underpinning the tip, and where the tip

5    came from.

6          Also what was not disclosed was the seizing FLA,

7    the -- the -- the foreign law enforcement agency that seized

8    the server.  And although the affiant made several assurances

9    about the tip giving FLA being a country with the rule of law

10   and a history of providing solid information, they made no such

11   assurances with respect to the seizing FLA, or whatever other

12   FLA might have been involved, because we just don't know, and

13   it hasn't been disclosed.  And the assurances that the tip

14   giving FLA did not interfere with the computer in the United

15   States to secure the information and deanonymize the IP address

16   is limited to the tip giving FLA, not to the -- to the seizing

17   FLA.

18         And it's -- it's our principal position that

19   Mr. Kiejzo should be informed about the manner in which the

20   information was seized, not just how it was disseminated to or

21   collected by what appears to be a secondary FLA.

22         Whether it was a network investigative technique,

23   whether it was malware or whether it otherwise interfered with

24   the U.S. computer is relevant to determine if there was

25   actually a search in this case that predated the search

1    warrant.  And it goes directly to the heart of *Valdivia*, which

2    is the First Circuit case that discusses joint investigation

3    issues and whether it involved activity that would have shocked

4    the conscience.

5          And, ultimately, at the heart of our discovery

6    requests, I think, are four things:  The relationship between

7    the tip giving FLA, the server seizing FLA and the United

8    States; the methodology used to deanonymize the IP address in

9    this case; the credibility or reliability of the tip; and the

10   completeness of the tip documents provided by the tip giving

11   FLA and the attempts at corroboration by U.S. law enforcement.

12         And all of the discovery requests seek to obtain

13   information about whether or not the search warrant was based

14   on reliable information provided by the tip giving FLA.  Again,

15   ultimately relayed and obtained from an as yet unnamed and

16   unknown second foreign law enforcement agency.  And it's also

17   necessary, we would suggest, to aid in the defense experts both

18   in a motion to suppress and a trial.

19         And where the government's assurances about the

20   lawfulness and the credibility of the tip are frequently

21   impossible to test without the discovery that we've requested,

22   we think it should be ordered for that reason as well.

23         But I want to first get to the issue of how Judge

24   Hennessy's ruling was contrary to law.  Judge Hennessy's

25   standard --

1          THE COURT:  So are you -- are you not alleging that it

2    was clearly erroneous?

3          MS. GANT:  I am.  If I could just address maybe the

4    legal standard first, and then I'll get into the -- the clearly

5    erroneous issues on the facts.

6          THE COURT:  So are you saying that -- I'm just trying

7    to get a sense of the -- the scope.  So you're saying it is

8    clearly erroneous and contrary to law?

9          MS. GANT:  That's right, your Honor.

10          THE COURT:  Okay.

11          MS. GANT:  And I'll begin with the latter.  So Judge

12    Hennessy's standard, which is plainly set forth at the hearing

13    on Mr. Kiejzo's motion to compel and in his order was that the

14    government had already provided sufficient evidence to enable

15    the defendant to file and litigate a motion to suppress.  So he

16    was not entitled to any more discovery.  But that's

17    inconsistent with the materiality standard that's articulated

18    in *United States versus Goris*, which requires some indication

19    that pretrial disclosure of the information sought would have

20    enabled the defendant significantly to alter the quantum of

21    proof in his favor.

22          What Judge Hennessy did was it took that some

23    indication language and -- and turned it effectively into a

24    significant indication, which is not the standard, and it's not

25    supported by the First Circuit.  It's also inconsistent, Judge

1  Hennessy's standard, with the discovery obligations and the

2  standards that are set forth in local Rule 116.2.

3       Ultimately, Mr. Kiejzo maintains that the requested

4  discovery is discoverable under both Rule 16 and local

5  Rule 116.2.  He requested them.  The government has them.  The

6  items are material to the preparation of his defense, and we

7  would suggest that they're exculpatory, because they cast out

8  on the accuracy of the information in the search warrant, and

9  it goes directly to the admissibility of evidence that the

10  government anticipates to offer --

11       THE COURT:  Counsel, can I ask you to speak a little

12  more slowly --

13       MS. GANT:  Absolutely.

14       THE COURT:  -- or Marianne's going to --

15       MS. GANT:  Absolutely.

16       THE COURT:  -- have words with you and me.

17       MS. GANT:  I was a high school debater so if you know

18  anything about that, they talk very fast.  So I apologize.

19       But ultimately, we would suggest that Mr. Kiejzo did

20  make his initial showing before Judge Hennessy, showing that

21  there are inaccuracies in the affidavit, and if those

22  inaccuracies are corrected and if omitted information is added

23  to the affidavit there would not have been probable cause to

24  search Mr. Kiejzo's home.

25       THE COURT:  So what are the inaccuracies?

1          MS. GANT:  So there are both inaccuracies and

2     omissions.

3          The search warrant affidavit and the affiant

4     ultimately presents the tip as a single solitary well-supported

5     tip from a single foreign law enforcement agency.  There's no

6     reference to it having originated from a second as yet unnamed

7     foreign law enforcement agency.  All the assurances about it

8     being a country of a rule of law and that no computer was

9     interfered with in the United States only applies to the tip

10    giver, not to the seizing FLA; and without information about

11    the methodology, without information about how that tip giving

12    FLA came to that information, there's zero information about

13    how reliable or credible the tip could have been.

14         THE COURT:  So the -- the affidavit recites

15    that -- the FLA advised the U.S. law enforcement that he

16    obtained the information through an independent investigation

17    that was lawfully authorized in FLA's country pursuant to its

18    national laws and that the FLA had not interfered with,

19    accessed, searched or seized any data from any computer in the

20    U.S.?

21         MS. GANT:  That's right, your Honor.  That is the

22    representation that's in the affidavit; however --

23         THE COURT:  And that's erroneous how?

24         MS. GANT:  Well, what's erroneous and what is -- what

25    is omitted is that the origin of the information -- ultimately

1    what we find out through the discovery documents, and that's in

2    the exhibits, is that the tip giving FLA relied it -- relied on

3    the issuance of bulk warrants to access this data without

4    information as to what the origin of the data was.  For all we

5    know, the tip giving FLA issued a warrant to the seizing FLA

6    for the information that it had obtained in its -- on the

7    server that it had seized, and the tip -- and I'm sorry.  The

8    seizing FLA, I think, supported, as I'll talk about in a moment

9    with the facts from *Mitrovich*, could have had U.S. assistance.

10   And it's clear at least at some point that the United States

11   was monitoring one of the particular websites, and I think it's

12   reasonable to conclude that they had a mere image of one of the

13   websites, and the facts as laid out in *Mitrovich*, which I'll

14   get to in a moment, demonstrate the capacity of U.S. law

15   enforcement at the front end with the seizing FLA to engage in

16   that joint investigation and kind of pass off the information,

17   launder it, so to speak, through the tip giving FLA.  So that

18   the tip giving FLA can say, we're authorized to issue both

19   warrants.  We got it lawfully.  This was our investigation,

20   because we issued the bulk warrant, but there's no information

21   as to where the information came from or how it was produced.

22          And to suggest that no computer was interfered with as

23   a blanket statement without discussing and mentioning that

24   there was a first FLA that seized the server and ultimately

25   collected this data that was then disseminated to the tip

1    giving FLA, that is hugely -- that is a huge omission, I think,

2    that goes directly to the heart of probable cause and directly

3    to the *Franks* issue.

4            Now, the government didn't file an opposition to the

5    defendant's objection here, but they did file an opposition to

6    the defendant's motion to compel, which was heard by Judge

7    Hennessy.  And both that opposition and Judge Hennessy's

8    decision essentially rests denial of the discovery request on

9    its characterizations of the defendant's grounds as

10   speculative.

11           It's a difficult position to be in because we're

12   essentially limited by the information that they've given us,

13   which is very little, and we did extensive research based on

14   the information that we had to -- to identify areas of

15   potential suppression grounds and *Franks* grounds.

16           In terms of the *Franks* issue, and I won't belabor this

17   point because I think our objection touches on this quite

18   heavily, but none of the cases cited by the government in their

19   opposition or even by Judge Hennessy in his order involve a

20   comparable dearth of discovery that we have here or a

21   comparable missing link in the chain here; and ultimately, the

22   standard that the government asks this Court to uphold and that

23   Judge Hennessy's misinterpretation of *Goris* suggests, is that

24   the government can withhold evidence relative and material to

25   the filing of a *Franks* motion and say, well, you haven't told

1    us what you think we have and how it could help your case or a

2    motion.  And that is an unattenable position.  It's

3    inconsistent with *Brady*, and it's inconsistent with the local

4    rules.

5          Judge Hennessy's factual findings were also erroneous

6    because ultimately he made several assumptions, which we now

7    know to be untrue about what the U.S. law enforcement did and

8    what they could have done in this case.  Judge Hennessy

9    essentially said there's no reason to believe that the United

10   States would have been involved on the front end of this to

11   engage with the seizing FLA, the foreign law enforcement

12   agency, to obtain the information and kind of launder it

13   through a reputable tip giving FLA.  But the Northern District

14   of Illinois case of *Mitrovich*, I think, is a perfect example of

15   not only how plausible this is, but of an example where the

16   court ordered discovery in this exact situation.

17         In *Mitrovich*, the FBI began investigating child

18   pornography websites in 2014.  That same year, the FBI obtains

19   the ability to identify IP addresses associated with the

20   website.  They learned it was hosted in the Netherlands with

21   the head administrator residing in Australia.  And the FBI then

22   gave that information to Australia, and law enforcement

23   agencies from Australia and New Zealand, seized control of the

24   website.  They operated it undercover, and they shared backup

25   copies of the website with the FBI, essentially doing the FBI's

1    dirty work so the FBI could say, our hands are clean.  We

2    didn't -- we weren't the ones that interfered with a computer

3    in the United States.  They get the -- they give this

4    information to foreign law enforcement agencies, and they're

5    the ones that do the network investigative technique.

6         In that case, one user clicked on a hyperlink, which

7    revealed his IP address based on this -- this technique that

8    New Zealand and Australia employed, and that user was in the

9    United States.  They transmitted that information, the

10   Australian and New Zealand employees transmitted that

11   information to the FBI, and they obtained records from Comcast

12   to identify the physical address associated with the

13   IP address.

14        That's what happened here in terms of the level of

15   corroboration.  All that the United States did in response to

16   emailing to get this what I would call laundered tip from the

17   tip giving FLA, was just to verify that the IP address was

18   registered to Mr. Kiejzo's home.  There was no other

19   corroborating information that would have suggested that more

20   than a year prior he had accessed a website or accessed

21   material.

22        And in *Mitrovich*, the Court found that the defendant,

23   we would suggest here, too, had made a prima facie showing that

24   the joint venture doctrine applied, and it held that the motion

25   to compel couldn't be denied, based on the government's

1    submission that the exclusionary rule didn't apply to the

2    investigatory conduct of Australia and New Zealand.

3           And I would also point the Court, which is cited in

4    our motion to the Ninth Circuit case of *United States versus*

5    *Budziak*, with a B, holding that it was an abuse of discretion

6    for the District Court to deny discovery relative to a software

7    program that was developed by the FBI to see what files

8    particular users were downloading, essentially saying that

9    criminal defendants should not have to rely on the government's

10   word that further discovery is unnecessary.

11          But Judge Hennessy's rulings were also erroneous as

12   evidenced by the defendant's supplemental memorandum and the

13   exhibits that were part of the defendant's supplemental

14   memorandum, because they substantially undermine the

15   government's repeated assertions that our claims are

16   speculative.

17          I would point the Court first to -- and I apologize.

18   Ms. Noto informed me that I double named the exhibits A through

19   et cetera on the -- on the objection, and A through et cetera

20   on the -- on the supplemental memorandum.  So I apologize if

21   that resulted in confusion.  But Exhibit G, as in George, to

22   our supplemental materials is the case of the *United States*

23   *versus Stauffer*.  And that case appears to have arisen out of

24   the exact same law enforcement investigation, the exact same

25   FLA tip, and the exact same website that is alleged to

1    be -- have been visited by the IP address registered to

2    Mr. Kiejzo's family.

3            In the criminal complaint in *Stauffer*, the government

4    says that ultimately agents talk to -- to the defendant in

5    January 2020, and he admits that he was on this website, and he

6    gave them his username and his password; and a few days later,

7    the FBI provided information that that online activity of that

8    specific username accessed that specific website during a

9    particular time frame that is the same here essentially.  And

10   the FBI provided a number of messages that had been posted by

11   somebody with the same username during that time frame.  And

12   the ultimate takeaways here from *United States versus Stauffer*

13   is that the FBI had a searchable copy of that website from

14   between 2016 and 2018.  It suggests that the United States'

15   role and investigation is much more significant than the

16   government has ever disclosed here.  It suggests that the FBI

17   had much more information about Mr. Kiejzo.

18           THE COURT:  So are you -- I mean, is it your position

19   that the affiant was being deliberately misleading?

20           MS. GANT:  I don't know the Court needs to find that

21   in order to grant the discovery, but I'm troubled by the

22   precision --

23           THE COURT:  It's not -- I'm not saying that.

24           MS. GANT:  But I'm troubled, I should say, by the

25   precision of the language that was used here, because what we

1    have here is this description of a tip -- of an FLA, without

2    describing a second FLA.  And although it says that the un-FLA

3    seized the server, there's no distinguishing between the two.

4    And that lack of precision, or maybe even the deliberate

5    precision to mislead the Court to believe that the tip was

6    single, solitary, reliable, credible coming from a country with

7    a rule of law, with no back history whatsoever, I would suggest

8    that is misleading.  Whether or not it was deliberate, I mean,

9    I don't think I can necessarily say, but the structure of

10   the -- of the affidavit -- of the affidavit is very troubling,

11   especially when the Court looks to all of the exhibits in the

12   supplemental memorandum, which show that the tip giving FLA

13   essentially gave the FBI tons of IP addresses; and that, I

14   think, goes to the issue of reliability, because if the tip

15   giving FLA gave the FBI tons of IP addresses and said IP

16   address in Texas, IP address in Northern District of Illinois,

17   in Massachusetts, in Tennessee, they all accessed a website on

18   a particular date and time, as opposed to one person accessed a

19   website on a particular date and time, and we have that

20   information based on credible information.  The difference

21   there, I think, suggests the deployment of a network

22   investigative technique, some development of technology or

23   methodology to be able to unmask that information and

24   deanonymize all of those IP addresses.  And I think that

25   the -- the fact that the affidavit fails to disclose all of

1    that and fails to give the true history of the case when we

2    have evidence that it is much more expansive and that the

3    United States was much more involved both at the front end and

4    that it had access to the particular website, as evidenced in

5    *Stauffer*; and that in *U.S. v. Clark*, which is Exhibit D, as in

6    dog, to our supplemental memorandum, it's evident that HSI

7    Agent Squire, who's based in Boston, who's a colleague of Agent

8    Moynihan, who drafted the affidavit in this case, and who

9    authored an identical search warrant affidavit in another case

10   out of the District of Massachusetts, it's clear that he viewed

11   the exact same type of website while it was operational.  So

12   there was some investigative work that was conducted not just

13   by the FBI, but by HSI and HSI in Boston, which is who is

14   prosecuting Mr. Kiejzo.

15        So I can go into the kind of individual discovery

16   requests, but I do want to point out that --

17        THE COURT:  No, I want you to wrap up, if you could,

18   please.

19        MS. GANT:  I do -- I'll just leave with one thing.

20        THE COURT:  Uh-huh.

21        MS. GANT:  At the motion to compel hearing, there was

22   some back and forth between the parties and Judge Hennessy as

23   to whether or not the government could have produced some

24   information or a slightly less redacted version of some of the

25   documents.  In the affidavit, for example, it indicates that

1   the tip giving FLA provided a number of tip documents that both

2   reference the website name and reference the IP address.  But

3   the documents that were provided by the government are not

4   consistent with that representation in the affidavit.  There

5   are certainly missing pieces that I think could be remedied by

6   an unredacting of the tip documents that we have, and I would

7   ask the Court to do that.

8           There's also some additional information in the

9   affidavit that suggests that there were other tip documents,

10  for example --

11          THE COURT:  Do you know what was the reason for the

12  redactions?  It may be better asked of Attorney Noto, but do

13  you know?

14          MS. GANT:  At least as in the discovery responses from

15  the government, it was that they didn't believe that it was

16  relevant to any motion to suppress or defense and that it was

17  relative to an ongoing investigation.

18          So I think I'll leave it there unless the Court wants

19  me to address anything else.

20          THE COURT:  I may give you the last word.  We'll see.

21          MS. GANT:  Okey dokey.  Thank you.

22          THE COURT:  Attorney Noto, please.

23          MS. NOTO:  Thank you, your Honor.

24          If you don't mind, I'm going to stay away from them

25  and take off my mask so you can hear me a little easier --

1          THE COURT:  Uh-huh.

2          MS. NOTO:  -- but if you prefer that I move to the

3     podium.

4          THE COURT:  And it's not me you should be worried

5     about.  It's Ms. Kusa-Ryll.  She needs to be able to hear and

6     see you.

7          MS. NOTO:  I'm sure she'll let me know.

8          Your Honor, the government's position is that Judge

9     Hennessy correctly decided the motion for discovery and that

10    you should maintain that order.

11         The defendant has argued that Judge Hennessy made a

12    number of incorrect factual findings, but I think when you

13    review his order you see he didn't make factual findings.

14    He -- he gave an example of why he thought the defendant's

15    argument was unlikely to carry the day, unlikely to be the only

16    explanation for how things could have turned out.

17         In referring to the *Mitrovich* case, the defendant is

18    giving an example of a completely separate investigation that

19    the FBI participated in and asking the Court to conclude that

20    therefore this must be the only way that the United States or

21    the FLA could have conducted an investigation.

22         I'd also like to clarify the defendant counsel said

23    several times that this information is information that the

24    government has, and I have tried to be very clear we do not

25    know the methodology employed by the FLA.  That is not

1    information that is in our records.

2           When Special Agent Moynihan put in her affidavit that

3    that had -- was a tip that came from the FLA and that they

4    represented that the United States had not been involved in

5    identifying or uncovering the IP address, that is the

6    information we have.  We don't know how they went about

7    uncovering the IP address.

8           What you've also been given is an affidavit that I

9    believe was marked as Exhibit M to the opposition, and it was

10   a -- this was a declaration of Professor Steven Murdoch

11   essentially asking the Court to adopt his statement, and I

12   would suggest that you should not give this any consideration.

13   It is not an affidavit, first of all, that was filed with

14   respect to this case.

15          As you see from the exhibit itself, it was filed in

16   the case of *United States versus Zachary Sanders*, which is a

17   case out of the Eastern District of Virginia.  Not only was

18   that filed in Virginia and not here in Massachusetts, there

19   have been multiple rulings on that case denying that

20   defendant's motions both for discovery and his motion to

21   suppress essentially not adopting Mr. Murdoch's position or

22   opinion that the only way this information could have been

23   obtained is through a NIT and necessarily a NIT that the United

24   States was involved in.

25          But again, I repeat, we do not have information on the

1    methodology that was used by the -- the tip FLA before they

2    provided it to us.

3          The argument, even as you've heard it today, is

4    speculative.  The seizing FLA could have been assisted by the

5    United States.  That is nothing but speculation.  I also don't

6    agree with the defendant's characterization that there was

7    anything hidden in the affidavit.

8          No affidavit will contain every detail of an

9    investigation, but the details in this affidavit are what was

10   necessary for the magistrate to find probable cause in order to

11   issue the search warrant of Mr. Kiejzo's home.  It is not

12   necessary, nor is it a material omission, that they didn't

13   identify every organization or every country that had been

14   involved in this investigation leading up to it.

15         THE COURT:  Do they know?

16         MS. NOTO:  Yes.

17         THE COURT:  So the affiant does know the so-called

18   chain or trail?

19         MS. NOTO:  I know that the FBI and HSI, the agencies,

20   know the identity of both countries.  I don't know if the

21   affiant personally knew the seizing FLA, the name of that

22   country at the time that she wrote out the affidavit.  She did

23   know the name of the tip FLA at the time she wrote it out.  But

24   yes, the government is aware of the country.

25         THE COURT:  Is that -- is that -- and I saw in the

1    papers who that was, is that secure for any reason?

2              MS. NOTO:  Yes, these -- information was provided with

3    the understanding that we would not be disclosing their

4    participation in this investigation.

5              THE COURT:  And I'm curious as to why that is.

6              MS. NOTO:  That is a decision made far above my level,

7    your Honor.  I don't know why that decision was made.

8              THE COURT:  Huh.  Okay.  Go ahead.  Just go ahead.

9              MS. NOTO:  But because there was a representation

10   about their reliability, we did provide that identity pursuant

11   to the protective order, because that is where the tip came

12   from.

13             Again, the defendant said that the -- the seizing FLA

14   would have collected the server and collected all the data.

15   That is another assumption that is made.  What we have

16   disclosed is that another country seized the servers, but the

17   data that we have came from the investigation done by the FLA

18   that we have disclosed.  And they have represented that they

19   did not interfere with computers in the United States in order

20   to conduct this investigation.

21             There's also -- there's no suggestion in the

22   affidavit, nor has it ever been the position that there were no

23   other United States based IP addresses that were identified

24   through the course of this investigation.  What we have

25   declined to do is provide the IP addresses or the other tip

1    particulars that do not pertain to this defendant.  But there

2    has never been a position that there aren't any others.

3            And while I -- I cannot tell the Court based on the

4    number of cases that the defendant has assumed our connection

5    to this.  I don't know if each and every one of those were

6    identified through this investigation.  It is not a secret that

7    there is more than one IP address that may -- that were based

8    in the United States that were identified.

9            What we have declined to do, as I said, is provide the

10   identifying information about any of the other potential users

11   to this defendant.

12           THE COURT:  By users?

13           MS. NOTO:  I mean IP addresses that accessed those --

14           THE COURT:  Okay.

15           MS. NOTO:  -- websites.

16           Also to have referred to this as a laundered tip is

17   again pure speculation.  The defendant wants to know how his

18   IP address was identified.  And I understand that.  But that

19   doesn't mean that he is entitled to know the process by which

20   his IP address was identified.

21           This is distinct from the -- the *Budziak* -- I don't

22   know that I pronounced that correctly -- where the FBI was

23   ordered to disclose the code used in their computer system,

24   because in that case the FBI was in possession of and was

25   activating that technology themselves.  This is not a similar

1    situation where they were relying on a tip that came from a

2    foreign law enforcement.

3          Your Honor, I don't have a lot more to add, and I

4    don't want to stand here to keep talking just to extend my

5    argument.  I -- I know the Court has reviewed the opposition

6    that we filed.  I do not find that the defendant has met his

7    burden to show that the findings of Judge Hennessy were either

8    clearly erroneous or contrary to law.

9          Everything that he has identified as exculpatory, I

10   would say, is at best, a speculation on his behalf, that if

11   some things were true, there may be something exculpatory that

12   is in the possession of one of these investigating agencies,

13   but that is not the standard for discovery.

14         And I'd also note that there was a case that was

15   referred to suggesting that there was a lower standard somehow

16   for the disclosure of evidence -- if I could just have one

17   moment.  I did want to address that.

18         The defendant was suggesting that in Massachusetts in

19   the *Jordan* matter, the Court was holding that when a defendant

20   seeks discovery to mount a *Franks* challenge, the production of

21   discovery should await an initial showing, not a substantial

22   showing.  That's, first of all, a magistrate decision that is

23   unreported.  So it's certainly not binding on the Court's

24   decision.  But that's also not everything that the Court said.

25   What the Court in *Jordan* said was at a minimum a defendant

1    needs to make a showing that there were inaccuracies in the

2    affiant's essentially repetition of a confidential informant

3    before they would consider giving additional information about

4    additional discovery on the reliability of that individual,

5    that confidential informant, but significantly what the

6    decision says that there's not -- no showing of any

7    inaccuracies in this case so they don't even meet the standard

8    of at minimum an initial showing.  There is no lowering of the

9    burden that the defendant must meet in order to obtain

10   additional discovery at this time.

11             THE COURT:  Thank you.

12             Is it Ms. Gant?

13             MS. GANT:  Ms. Gant, yes.

14             THE COURT:  I'll give you the last word as long as

15   you're brief.

16             MS. GANT:  I'll be brief.  I just have two things to

17   say.  The factual record before your Honor, frankly, is far

18   more extensive and developed than has been presented to any

19   court that we're aware of that is dealing with this law

20   enforcement investigation.

21             The government talks about the Murdoch declaration in

22   the *Sanders* case in the Eastern District of Virginia.  In that

23   case, the government never disclosed that there was a second

24   seizing FLA.  The defendant went to trial, despite the

25   government never having disclosed it, and now there's a motion

1    for a new trial pending on *Brady* grounds.  That's what we're

2    seeking to avoid here.  But I'm glad that Ms. Keefe -- Ms. Noto

3    raised the confidential informant example, because this brings

4    me back to my roots in State Superior Court.

5         THE COURT:  Slowly, please.

6         MS. GANT:  Okay.  I'm glad that she raised this,

7    because this really is, I think, maybe an unsophisticated

8    example, but it brings me back to my roots in Superior Court.

9         This is essentially like a confidential informant

10   based on multiple-level hearsay.  What we have is a tip giving

11   FLA saying here's this information that we think so and so

12   committed a crime.  They accessed a website to access child

13   abuse and exploitation material on a particular day.  The FBI

14   never asks:  How do you know that?  How did you get that

15   information?  Who told you that?  Where did that information

16   come from?  Those questions apparently are never asked, and

17   Ms. Noto wants the Court to permit the government to bury its

18   head in the sand and say, we don't know so we shouldn't have to

19   find out.

20        What ultimately is developed in the factual record,

21   and this is the last thing I'll say, is that that tip giving

22   FLA either never discloses to the FBI at the time of the tip,

23   or the FBI knows it, that the information comes from somebody

24   else, somebody else who's not identified to the magistrate or

25   to the parties, somebody else who we don't know who comes from

1   a country with a rule of law, and somebody else who we don't

2   know has a solid basis of information.  So that extended link

3   in the chain should be fatal, I think, to the government's

4   claims that his requests are unfounded and unnecessary for the

5   preparation of a defense.  But I'll rest on our extensive

6   pleadings.

7           THE COURT:  What's the guideline on this one?

8           MS. GANT:  I don't actually know, Your Honor.

9   Mr. Kiejzo has no record whatsoever.  There was a single thumb

10  drive that was taken from his home not related to the website

11  that was alleged to have been visited in May.

12          THE COURT:  Is there any minimum mandatory?

13          MS. GANT:  No, there's no minimum mandatory.

14          THE COURT:  Okay.

15          MS. GANT:  I think with the -- with the child

16  pornography guidelines, I would assume they're high only

17  because of the number of kind of dynamic factors but --

18          THE COURT:  How many images are there at issue?

19          MS. GANT:  I don't know that I have that information

20  offhand.  I may defer to Ms. Noto, but it was a single thumb

21  drive, I think, with some video and some photographs.

22          MS. NOTO:  I just don't remember, your Honor --

23          THE COURT:  Yeah --

24          MS. NOTO:  -- unfortunately.

25          THE COURT:  -- it's not germane to what I've got to

1   do.

2           And this case is still with Hennessy, correct?

3           MS. GANT:  It is.

4           MS. NOTO:  It is.

5           MS. GANT:  We have a status conference next week at

6   which point I anticipate that, depending on the Court's ruling

7   here, he'll probably set a briefing schedule.

8           THE COURT:  Okay.  Thank you.  Nice job, you guys.

9           MS. GANT:  Thank you, your Honor.

10          (Whereupon, at 4:12 p.m., Court was adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3            I, Marianne Kusa-Ryll, RDR, CRR, do hereby

4    certify that the foregoing transcript is a true and accurate

5    transcription of my stenographic notes before the Honorable

6    Timothy S. Hillman, to the best of my skill, knowledge, and

7    ability.

8

9

10       /s/ Marianne Kusa-Ryll                        3-24-22

11       Marianne Kusa-Ryll, RDR, CRR                Date

12       Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25